INTERSTATE CHEMICAL CORPORATION and Others, Appellants, *v.* JAMES B. DUKE, Respondent.

First Department, March 23, 1917.

Contract — option to exploit chemical process if test thereof proves satisfactory — equity — suit to reform written agreement by adding alleged oral agreement contradictory to terms of writing — when hurried execution of writing no grounds for reformation — acts indicating acquiescence in written contract — partnership — when writing does not create joint adventure.

Where the plaintiffs, a corporation and its officers and stockholders, who were interested in developing and perfecting a patented process for the chemical manufacture of fertilizers and in the formation and financing of another corporation to be organized for that purpose, entered into written agreements with the defendant which were stated to be "options" which provided that in the event that the defendant "shall be satisfied" with the results obtained from an experimental plant to be erected by the plaintiffs for the purpose of demonstrating that the chemical process could be carried on commercially on a large scale; but the contracts in express terms provided that the defendant should be entirely free not to avail himself of the option if the said tests should not be satisfactory to him, or for any cause, and that "in the event of his refusing, declining or failing for any cause to exercise said option and form or cause to be formed the New Company, no liability whatever shall rest upon him," and at the completion of the tests the defendant refused to exercise his option or go further with the enterprise, the plaintiffs suing in equity are not entitled to a decree reforming said written contracts by inserting therein the terms of an alleged oral agreement to the effect that the defendant would regard the test as

satisfactory and would proceed with the enterprise according to the terms of the written agreement if the test demonstrated that the process would produce a certain number of pounds of the chemical product per horse power in twenty-four hours.

This, because, assuming the oral agreement to have been made (which fact is denied by the defendant), the case is not brought within one of the exceptions to the rule that parol evidence cannot be received to contradict or vary the terms of a written instrument. These exceptions are, *first*, where the parol evidence shows that the written contract is in fact no contract at all by reason of fraud, illegality, want of consideration, etc.; *second*, where the written contract is incomplete upon its face and does not embody the complete agreement of the parties.

The alleged oral agreement to abide by the test if certain results were obtained expressly contradicts the terms of the writing, which gave entire discretion to the defendant, at his option, to embark upon the enterprise or to refuse to do so.

The proposed reformation cannot be justified upon the grounds that the plaintiffs were hurried into the execution of the writing and were not aware of the omission, for, even if that were so, it would only be grounds for avoiding the contract *in toto* and not for a reformation thereof.

Moreover, the proposed reformation should be denied for laches and by reason of acquiescence therein where the plaintiffs submitted it to their counsel, entered into other contracts in reliance thereon, and worked under the written contract for at least a year without any suggestion that it did not correctly express the true contract between themselves and the defendant.

Moreover, the written agreement cannot be treated as one creating a joint adventure or partnership so that property which the defendant personally acquired with a view of carrying out the enterprise should be impressed with the trust in favor of the plaintiffs, for, under the contract, there could be no joint adventure until the defendant accepted the option.

APPEAL by the plaintiffs, Interstate Chemical Corporation and others, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 29th day of February, 1916, dismissing the complaint upon a decision of the court after a trial before the court without a jury.

*John C. Tomlinson,* for the appellants.

*Charles F. Brown,* for the respondent.

SCOTT, J.:

The action is in equity and has to do with certain contracts made between the plaintiffs and the defendant and one Thomas

First Department, March, 1917.          [Vol. 176.

L. Willson, all relating to the proposed development and exploitation of a process said to have been invented by said Willson for the production of free phosphoric acid from phosphate rock without the use of sulphuric acid, and for the production in connection therewith of commercial fertilizers. Some of these contracts it is sought to annul. Others it is sought to specifically enforce after they have been modified by the addition of oral terms said to have been improperly omitted from the written documents, and it is further asked that the defendant be required to account to plaintiffs for large sums of money said to be due from him. In the appellant's brief it is suggested that owing to the lapse of time and changed conditions it would be impracticable to give plaintiffs adequate relief by the form of decree asked for in the complaint, and that the proper relief would be a judgment for money damages. A brief history of the case is essential to the proper consideration of the questions involved.

The plaintiff corporation is incorporated under the laws of the State of Virginia, and has been for some years engaged in the business of manufacturing and selling chemical fertilizers, owning various plants, and either owning or controlling large beds or mines of phosphate rock in the State of Florida. The individual plaintiffs are officers and directors of said corporation and large owners of its stock and bonds.

In and prior to the year 1912, one Thomas L. Willson of Ottawa, Canada, had invented and obtained patents for a process of manufacturing free phosphoric acid from phosphate rock without the use of sulphuric acid and had devised a method and series of processes by which such free phosphoric acid might be used and treated so as to produce what is described in the case as " ammoniated double superphosphate " to be used in the production of fertilizers. It was believed by the said Willson and by these plaintiffs that the aforesaid processes were of great value if the product could be produced in quantities and at a cost which would make it commercially available. To so produce it would require heavy currents of electricity which could be economically generated only by means of water power. Willson had accordingly acquired certain real property and water rights in and about the Saguenay

river in Canada, and in and about the Shipshaw river, a tributary of said Saguenay river. The aforesaid patents, processes and water rights were owned by said Willson or by companies organized or controlled by him. On September 17, 1912, the said Willson and the plaintiff Chisholm (acting in behalf of himself and the other plaintiffs) made a contract by which the said Chisholm obtained an option to purchase from Willson and the companies controlled by him all of the rights and property above indicated for the gross sum of $2,000,000, of which $650,000 was to be paid to Willson in cash and the balance was to be paid by stocks and bonds of a corporation to be organized for the purpose of acquiring the aforesaid rights and property as well as the assets of the corporation plaintiff, which latter were valued at $6,450,000. Chisholm also agreed to loan Willson in advance the sum of $150,000, repayable in one year, to be secured by a pledge of the title papers of the water rights and real estate on the Saguenay river. Having secured this option, the plaintiffs, being unable or unwilling themselves to finance the proposed corporation, sought to engage the interest of the defendant Duke, a man of wealth, already largely interested in the business of producing and selling electricity and in other enterprises in which large currents of electricity generated by water power were an important factor.

At the individual plaintiffs' solicitation the defendant in the month of September accompanied them to Ottawa, where he inspected Willson's laboratory, and to the Saguenay river, where he inspected Willson's water rights and real estate. Defendant was also shown a technical scientific report upon the value of the so-called "Willson Process," written by Dr. Philip E. Chazal, an expert employed by plaintiffs. As a result of this visit of inspection and the representations contained in the Chazal report, the defendant entered into two contracts. By the first, attached to the complaint and known as Exhibit B, and dated October, 1912, Willson gave and granted to defendant the right and option to acquire at any time within a year for a company proposed to be organized by him, at the price of $650,000, all of said Willson's water rights and property in the Saguenay river. Willson also agreed to assist, so far as he reasonably could, the defendant in negotiating and purchasing

what is described as the "upper Property." This contract contained the following clause: "This contract shall not be treated or considered as making it obligatory upon the said Duke to form the New Company, or to purchase, or cause the purchase by the New Company, if formed, the properties aforesaid, or either of them, or any part thereof; but as respects each of these things, he is to be free to do as he may elect after he has made further investigation."

The plaintiff corporation consented to this agreement and expressed that consent by joining in the execution thereof.

On the same day and at the same time these plaintiffs and defendant executed a contract attached to the complaint and known as Exhibit C. This contract, around which the present controversy centers, starts with an enumeration and valuation of the assets of the plaintiff corporation and the amount of its indebtedness, and also enumeration and description of the patents, processes and property upon which Chisholm held an option to purchase from Willson. Inasmuch as the experiments with the so-called Willson process had up to this time been confined to the laboratory, and its adaptability to the production of acid in commercial quantities and cost had not yet been demonstrated, it was first provided that the plaintiff corporation should at its own cost establish an experimental plant at Charlotte, N. C., in connection with its fertilizer plant at that place, with a view to demonstrating on a commercial scale the efficiency of the Willson patents and process, the defendant furnishing, without cost to said corporation, the necessary electric current. The contract then provided that "in the event the said J. B. Duke shall be satisfied with the operation of said plant and the efficiency of said process" he should within six months from the date of such satisfactory test "have the right" to form or cause to be formed a company for the purchase and acquisition of the Willson patents and the Shipshaw property and the stock belonging to the stockholders (the individual plaintiffs herein) the same being a majority of the capital stock of the chemical company (the plaintiff corporation). The corporation thus proposed to be formed was designed upon a large scale. It was to have a capital of $10,000,000, of which defendant was to provide

$8,000,000 and the individual plaintiffs $2,000,000. The new company was to acquire all of the Willson properties and patents, and all of the assets of the plaintiff corporation and the phosphate rock mines owned by certain of the individual plaintiffs, and was to issue its stock for the stock of the plaintiff corporation. Throughout the contract, and in several places therein the agreement is described and referred to as an " option " given to defendant, and the 4th paragraph provides as follows: " It is distinctly understood and agreed· that the said J. B. Duke shall be entirely free not to avail of the foregoing option if the test of the Willson process aforesaid shall not be satisfactory to him, or the protection secured by the Patents aforesaid, or the title to any of the properties aforesaid, shall not be satisfactory, or for any other cause, and in the event of his refusing, declining or failing for any cause to exercise said option and form or cause to be formed the New Company, no liability whatever shall rest upon him."

The plaintiff corporation proceeded to install a plant at Charlotte and to pursue experiments designed to demonstrate the commercial value and efficiency of the " Willson process." Before it had succeeded in this effort the loan of $150,000 made by defendant to Willson came due and was renewed, and defendant's option to acquire the Saguenay water rights was extended so as to expire when defendant's option to acquire the other property from plaintiffs should expire, the price at which said water rights might be acquired being reduced to $150,000. The defendant also acquired by private treaty and at a large figure the so-called Haggin water rights on the upper Saguenay river.

In November, 1913, soon after the aforesaid loan to Willson was renewed, it transpired that he was seriously embarrassed financially, and was in danger of being thrown into bankruptcy, and it was feared that, if this happened, the plans which had been made to develop and exploit his properties and process might be seriously hampered. Consequently, by an agreement signed by all the parties in interest, all of the foregoing contracts were canceled and annulled and a new set of contracts entered upon, all dated November 15, 1913. By the

first of these contracts attached to the complaint, and known as Exhibit H, defendant purchased from Willson and the companies controlled by him all of said Willson's water rights, property, patents and processes at the price or sum of $377,000, including the $150,000 already loaned.   By the second contract also attached to the complaint, and known as Exhibit G, these plaintiffs and defendant renewed, in effect, their earlier contract looking to the organization of a new company, changed, however, to meet the changed condition resulting from defendant's acquisition of the Willson properties and patents.   The optional feature of the contract, so far as defendant was concerned, was renewed and continued, the following clause being incorporated, viz.: " It is distinctly understood and agreed that the said party of the second part shall in his discretion exercise or fail to exercise the foregoing option, regardless of the success of the test of the Willson process aforesaid; the protection secured by the Willson Patents aforesaid; or the titles to any of the properties aforesaid; and in the event of his refusing, declining or failing for any cause to exercise said option and form or cause to be formed the New Company, no liability whatever shall rest upon him.   He shall in no event be obliged to exercise said option or form the New Company unless he shall in writing addressed to the Chemical Company specifically indicate that he desires to do the same."

The defendant agreed, in case he exercised his option, to turn over to the new company the properties he had acquired from Willson, at the price he had paid for them.   If he refused to exercise his option he agreed to allow plaintiffs six months within which to organize a company on the same lines which had been proposed, and agreed to turn over to such corporation all the properties acquired from Willson and his companies, at the aggregate price of $2,000,000.

The plaintiff corporation continued its experiments and efforts to work the so-called " Willson Process " so as to establish its commercial value, and finally in January, 1914, succeeded in producing what it and the individual plaintiffs considered to be a satisfactory result.   On January 23, 1914, they communicated this fact to defendant in a letter, the concluding paragraph of which read as follows:   " We beg, there-

fore, to submit the demonstration to you, and to ask you if you are satisfied with the efficiency of the process, and desire to exercise the option in your favor given under the terms of said agreement," the reference being to the contract of November 15, 1913, known as Exhibit G. The defendant replied definitely declining to exercise his option or to go further with the enterprise. Plaintiffs sought to enlist the co-operation of another capitalist, but without success. This action followed.

What the plaintiffs seek is, in effect, that defendant be required to account to them for what they claim to be their share or interest in the value of all the property, patents and processes, which the defendant acquired from Willson, as well as the so-called upper Saguenay water rights which defendant acquired from Haggin, as to which latter property plaintiffs never had any contract of purchase, option or other interest.

To achieve this result it is sought to cancel and annul all of the agreements above enumerated and executed on November 15, 1913, and to obtain an adjudication that the contract of October 12, 1912, was not wholly expressed in the paper writing, Exhibit C, but was partly oral and partly written, the oral terms being a positive agreement on the part of defendant that if, as a result of the commercial test of the Willson process at Charlotte, "there was produced 3.70 pounds of free phosphoric acid per horse power, per twenty-four hours," he would regard that test as satisfactory, and would proceed to form the corporation and do the several things he had agreed to do if satisfied, under the terms of said Exhibit C. It is alleged in the complaint that this oral agreement was made "during the progress of said tests and demonstration at Charlotte," which, if true, would have necessarily meant that it was made some months after Exhibit C was executed, and hence it could not have been a part of the agreement arrived at when the agreement was made, and omitted therefrom by mistake or design.

The evidence, however, tends to show that if anything of the sort was ever agreed to it was during the visit of the individual plaintiffs and the defendant to Canada, in September, 1912, which preceded the execution of Exhibit C. The defendant vigorously denies that he ever at any time made such an agreement, and the testimony of plaintiffs leaves it in

much doubt whether whatever may have been said on that subject amounted to anything more than an expression of intention on defendant's part rather than a definite agreement. At all events, no such agreement was incorporated into the contract as written, and the serious question is, even if we assume that it was made, whether the contract can now be reformed by writing it in or treating it as a part of a complete contract only partially evidenced in writing. The rules applicable to such a case are well established, and were satisfactorily and authoritatively stated by the Court of Appeals in *Thomas* v. *Scutt* (127 N. Y. 133) in which the court said: "It is a general rule that evidence of what was said between the parties to a valid instrument in writing, either prior to or at the time of its execution, cannot be received to contradict or vary its terms.

"This rule is not universal in its application, because the courts, in their effort to prevent fraud and injustice, have laid down certain exceptions, which, although correct in principle, are sometimes so loosely applied in practice as to threaten the integrity of the rule itself. (1 Greenleaf on Ev., § 284,a.) The real exceptions may be grouped into two classes, the first of which includes those cases in which parol evidence has been received to show that that which purports to be a written contract is in fact no contract at all. Thus, fraud, illegality, want of consideration, delivery upon an unperformed condition and the like may be shown by parol, not to contradict or vary, but to destroy a written instrument. Such proof does not recognize the contract as ever existing as a valid agreement and is received from the necessity of the case to show that that which appears to be, is not and never was a contract *   *   *.

"The second class embraces those cases which recognize the written instrument as existing and valid, but regard it as incomplete, either obviously, or at least possibly, and admit parol evidence, not to contradict or vary, but to complete the entire agreement of which the writing was only a part. Receipts, bills of parcels and writings that evidently express only some parts of the agreement are examples of this class which leaves the written contract unchanged, but treats it as part of an entire oral agreement, the remainder of which was

not reduced to writing.   Two things, however, are essential to bring a case within this class: 1. The writing must not appear upon inspection to be a complete contract, embracing all the particulars necessary to make a perfect agreement and designed to express the whole arrangement between the parties, for in such a case it is conclusively presumed to embrace the entire contract.   2. The parol evidence must be consistent with and not contradictory of the written instrument." (See, also, *Lese* v. *Lamprecht*, 196 N. Y. 32; *Marsh* v. *McNair*, 99 id. 174; *House* v. *Walch*, 144 id. 418; *Loomis* v. *N. Y. C. & H. R. R. Co.*, 203 id. 359.)

Tested by these rules it appears to be quite clear that we can neither read into the contract Exhibit C a positive agreement on defendant's part to be satisfied and go on with the scheme if the experiments at Charlotte produced a certain result, nor hold that the true agreement was partly oral and partly written consisting of Exhibit C and the oral agreement indicated.   The writing certainly appeared upon its face to express a complete contract, and the oral term sought to be tacked onto it was distinctly contradictory of the written instrument in that, while the written agreement clearly extended to defendant a discretionary option to embark upon the enterprise or to refuse to do so, the oral term would impose upon him an absolute obligation to go on upon the happening of a doubtful and not very well-defined contingency.

The plaintiffs attack the agreement, Exhibit C, very vigorously upon the ground that they were hurried into executing it and were not aware when they did execute it that it omitted the clause which they now seek to establish as part of the contract.   If that contention should succeed it could only be as a reason for avoiding the contract *in toto*.   But that is not what plaintiffs seek to accomplish.   Their purpose is to uphold the contract, superadding to it the alleged oral agreement.   Besides, the plaintiffs, by long acquiescence, forfeited any right they may have had, if they had any, to cancel the agreement Exhibit C for fraud.   If they did not understand its precise terms when they executed it they certainly became aware of them immmediately afterwards, for they at once submitted it to counsel and entered into a new agreement with Willson in which they expressly rati-

fied, confirmed and approved, as well the agreement Exhibit C as the agreement between Willson and defendant known as Exhibit B. Furthermore, they worked under the contract Exhibit C for at least a year without any suggestion, so far as appears, that it did not correctly express the true contract between themselves and the defendant. "A party entitled to rescind a contract for fraud may deprive himself of this remedy by acquiescence; * * *. A party claiming to rescind a contract for fraud must act promptly on discovery of the fraud, and restore, or offer to restore, to the other party what he has received under it. He cannot thereafter deal with the other party on the footing of an existing contract, or with the property acquired under it as his own." (*Schiffer* v. *Dietz*, 83 N. Y. 300; *Grymes* v. *Sanders*, 93 U. S. 55; *Cobb* v. *Hatfield*, 46 N. Y. 533; *Bach* v. *Tuch*, 126 id. 53.)

If the contract of October, 1912, known as Exhibit C, cannot be legally abrogated, amended or supplemented, it is of little consequence, so far as concerns any of the relief which plaintiffs seek, whether the contracts of November 15, 1913, are annulled or not. If that question was important we should have no hesitation in saying that the attack upon them must likewise fail. It may be that defendant sought to drive a hard bargain. Upon that question we are not called upon to express an opinion, but, hard or not, it was a bargain into which plaintiffs entered with their eyes open, and of which they afterwards sought, although unsuccessfully, to take advantage.

Finally it is said that through the agreements hereinbefore recited the plaintiffs and the defendant embarked upon a common enterprise and became coadventurers, and, consequently, that whatever property defendant acquired with a view to carrying out the enterprise should be impressed with a trust in favor of plaintiffs and himself.

But it is clear that the parties did not become partners or joint adventurers. Plaintiffs brought to defendant a proposition to embark upon a joint enterprise and defendant agreed to enter upon it, if, upon further experiments, its commercial value and utility should be established to his satisfaction. No standard of satisfaction was agreed upon, at least in the written contracts, that question being left solely to defendant's

judgment.   In other words, he was given an option to enter into a joint adventure, which he was left at entire liberty to accept or reject.   If he had accepted the relation of joint adventurers would have been established, but he did not.   The fact that, while it was yet undetermined whether or not the joint adventure would be entered upon, defendant acquired Willson's patents and property does not enter into the question.   That was done in each instance with plaintiffs' acquiescence and approval, and probably at their solicitation, in order to maintain control of the properties in case defendant should elect to exercise his option, and the joint adventure should be embarked upon.

The judgment is affirmed, with costs.

CLARKE, P. J., SMITH and DAVIS, JJ., concurred.

Judgment affirmed, with costs.